IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) 2:05-cr-0324 |
| MAMADOU DIALLO, | ) Judge Thomas M. Hardiman |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION

On April 12, 2006, a jury convicted Defendant Mamadou Diallo (Diallo) of trafficking in

counterfeit goods in violation of 18 U.S.C. § 2320(a).[1]  Diallo's Motion for Judgment of

Acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure is the subject of this

Memorandum Opinion.

## I.    Introduction

On October 26, 2005, a grand jury issued a one-count indictment charging Diallo with

violating 18 U.S.C. § 2320(a).  The indictment read, in pertinent part:

> [Diallo] did intentionally traffic, and attempt to traffic, in goods, those
> being handbags, while knowingly using counterfeit marks on and in
> connection with such goods, specifically, spurious marks identical with,
> and substantially indistinguishable from, trademarks of Louis Vuitton
> Malletier, a French corporation [...] which marks were in use and were
> registered for those goods on the principal register of the United States
> Patent and Trademark Office, the use of any one of these counterfeit marks
> being likely to cause confusion, to cause mistake, and to deceive.

(Doc. No. 21, at 1).  Diallo's jury trial began on April 10, 2006 and concluded two days later,

---

[1]    Except where otherwise noted, all citations to 18 U.S.C. § 2320 will refer to the 2005
version of the statute.

when the jury found him guilty of that charge. Diallo timely filed the instant Motion, and the Government filed its Response to the Motion on January 19, 2007. On January 29, 2007, Diallo filed his Reply, and the record of the trial proceedings was transcribed by order of Court.

## II. Facts

In the early morning hours of July 13, 2005, Trooper Timothy Callahan of the Pennsylvania State Police was patrolling Interstate 80 in Mercer County, Pennsylvania, when he noticed a van traveling without a license plate light. Callahan stopped the van — which was driven by Diallo and contained one passenger — with the intention of ticketing its driver.

After Diallo produced a driver's license and vehicle registration, he explained that he and his passenger were returning to Indianapolis from New York. When Callahan inquired as to the contents of several bags and boxes in plain view inside the vehicle, Diallo answered "clothes," and offered Callahan the opportunity to inspect the vehicle. Callahan discovered approximately 300 items of designer clothing, jewelry, and handbags bearing the trademarks of Louis Vuitton and other high-end designers. Diallo admitted that these items belonged to him and his passenger. Upon inspection, Callahan noted that the handles of the "Louis Vuitton" handbags in Diallo's van were wrapped in plastic, a packaging feature that distinguished them from real Louis Vuitton bags. Based on Callahan's knowledge, training, and experience, he concluded that these bags were counterfeit and he arrested Diallo and his passenger.

On July 22, 2005, Special Agent Sara Seidman of United States Immigration and Customs Enforcement (ICE) interviewed Diallo regarding his possession of counterfeit goods. Diallo told Seidman that he had been arrested in the past for selling counterfeit compact discs,

2

but claimed to be unaware that it was illegal to sell the handbags he had purchased from various vendors in New York. Diallo stated that he purchased the handbags for approximately $40 each and sold them for approximately $50-$55 apiece at "Diallo's Clothing," his booth at a flea market in Indianapolis.

The Government's investigation revealed that Diallo had a history of selling knock-off designer products, including counterfeit handbags. Indianapolis Police Detective Andrew Starks and private investigator Donald Finch first encountered Diallo in the Peddler's Mall in Indianapolis in 2003, where they found him attempting to sell some 700 handbags. Diallo was arrested, acknowledged his culpability, and stated that his wife had "asked him to stop" selling this merchandise "several times" because she was "afraid." Diallo explained that he had purchased the items in bulk during trips to New York City every two months. Diallo eventually pleaded guilty to that charge in February 2004.

Later that year, however, Diallo was back in the business of selling knock-off designer merchandise. One of Diallo's customers, Jane Roudebush, testified that Diallo had sold her dozens of fake Louis Vuitton purses at the Peddler's Mall in 2004. Each time, Diallo assured Roudebush that the purses were authentic; on one occasion Diallo told her: "I go to Paris and I buy these myself." Diallo even attempted to persuade Roudebush to sell some of his purses out of her home at "purse parties." Upon inspecting a real Louis Vuitton purse at her local Saks Fifth Avenue retailer, however, Roudebush realized that Diallo's purses were fake. She promptly told Diallo that she would not sell any of his purses, and returned most of them without receiving a refund. In October 2004, Detective Starks and investigator Finch spotted Diallo selling counterfeit handbags and seized 700-800 items after Diallo fled the scene.

3

The jury also heard the testimony of Housseinou Diakhaby, the passenger in Diallo's van the night Trooper Callahan detained it. Diakhaby explained that he had operated a booth near Diallo's at the Peddler's Mall in 2004 and 2005. He stated that he had gone to New York City on two occasions with Diallo, and told the jury about the outdoor market where he had seen Diallo purchase the handbags. When Callahan detained the pair on their return from their second New York trip, Diallo initially attempted to cajole Diakhaby into claiming that the bags were his because Diallo "ha[d] a problem with a detective before on those items." Diakhaby refused, however, and testified that all but six or seven of the articles in the van belonged to Diallo. He also corroborated the testimony of Detective Starks and investigator Finch about Diallo's incriminating conduct following the October 2004 police raid on his stalls at the Peddler's Mall.[2]

On April 11, 2006, at the close of evidence, Diallo moved for judgment of acquittal on the ground that there was insufficient evidence to show that he had *used* any Louis Vuitton mark in connection with a good or service, a component of the Government's burden of proof under 18 U.S.C. § 2320(a). Because this theory presented an issue of first impression, this Court reserved its ruling on the motion and permitted the case to go to the jury without a definition of the term, as it appears in the statute. Late that afternoon, the Court received a question from the jury, which read: "What is the definition of 'use,' as it pertains to this trial between the dates of July

---

[2]     Diakhaby testified that he was among the bystanders present when Starks and Finch approached one of the four booths that Diallo operated at the Mall in October 2004. He confirmed that Diallo spotted the police before they spotted him, however, and fled the scene, abandoning his merchandise. Officers confiscated the merchandise, including some "Louis Vuitton" purses. When Diallo returned the following day, he explained to Diakhaby that he had fled because he recognized Starks. Diakhaby noted that Diallo continued to sell "designer" bags, but he did not display them as he had before.

11, 2005 and July 13, 2005, and the third and fourth elements of the charge. Is it pertaining to a physical explanation or use of one or more senses?"

The following day, on April 12, 2006, the Court solicited the arguments of counsel as to how the term "use" should be defined. After considering those arguments, reviewing the legislative history of Section 2320(a), and consulting various dictionary definitions of the word "use," the Court decided to give the word "use" its ordinary and natural meaning. The Court then instructed the jury quoting the Fifth Edition of Black's Law Dictionary (1979) as follows: "Definition of the word 'use': To make use of, to put into action or convert to one's service, to avail oneself of, to have recourse to or enjoyment of, to employ." The Government accepted this instruction but Diallo objected only as to the final clause — "to have recourse to or enjoyment of." Later that day, the jury returned a guilty verdict.[3]

## III.    Standard of Review

Federal Rule of Criminal Procedure 29(a) states that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." As Rule 29(a) makes clear, the "sole foundation upon which a judgment of acquittal should be based is a successful challenge to the sufficiency of the government's

---

[3]     On May 4, 2006, it came to the Court's attention that during deliberations the jury foreman had used an electronic device to look up the definition of the term "use." The Court conducted individual *voir dire* of eleven of the twelve jurors separately to determine what effect, if any, this had on the deliberations; all of the jurors questioned stated that the foreman's unauthorized use of his electronic dictionary did not affect their deliberations — other than to prompt them to send the written inquiry about the term "use" to the Court, which definition they then assured the Court they followed in reaching their verdict. Diallo waived *voir dire* of the twelfth juror.

evidence." *United States v. Carter,* 966 F. Supp. 336, 340 (E.D. Pa. 1997) (citation omitted); *see also* 2A Charles Alan Wright, *Federal Practice and Procedure* § 466 (3d ed. 2000).

In considering a Rule 29 motion for judgment of acquittal, the Court must evaluate the evidence in the light most favorable to the Government. *See United States v. Flores,* 454 F.3d 149, 154 (3d Cir. 2006) (citation omitted). "A verdict will be overruled only if no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." *United States v. Coleman,* 811 F.2d 804, 807 (3d Cir. 1987) (citation omitted). "The evidence need not unequivocally point to the defendant's guilt as long as it permits the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Pungitore,* 910 F.2d 1084, 1129 (3d Cir. 1990). In applying this standard of review, the Court "must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *Flores,* 454 F.3d at 154 (citation omitted). Thus, acquittal should "be confined to cases where the prosecution's failure is clear." *United States v. Leon,* 739 F.2d 885, 891 (3d Cir. 1984). As the foregoing standard suggests, a Rule 29 movant bears a heavy burden to prove the evidence presented was insufficient to support the verdict. *See United States v. Gonzalez,* 918 F.2d 1129, 1132 (3d Cir. 1990) (citation omitted).

## IV. Discussion

The version of 18 U.S.C. § 2320(a) applicable to Diallo's conduct was captioned

"Trafficking in counterfeit goods or services," and provided criminal penalties for one who

> intentionally traffics or attempts to traffic in goods or services and
> knowingly uses a counterfeit mark on or in connection with such goods or
> services [ . . . ].

Thus, to convict Diallo of a violation of Section 2320, the Government had to prove that he (1)

trafficked or attempted to traffic in goods or services; (2) did so intentionally; (3) used a

counterfeit mark on or in connection with such goods or services; and (4) knew the mark was

counterfeit. *See id.* Acquittal is required if the Government fails to prove any one of these

elements. *See also* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §

25:14 (4th ed. 1997).

Although Diallo concedes that the Government has met its burden of proof as to the first,

second, and fourth elements of the crime, he claims that there was insufficient evidence that he

"used" a counterfeit mark. Specifically, Diallo argues:

> [T]he word "uses," as it appears in 18 U.S.C. § 2320(a), means "active
> employment," *i.e.*, it means that the charged offense in this case requires
> proof that [Diallo] actively employed a counterfeit mark on goods which
> he was transporting — entirely sealed up in bags and boxes — in the back
> of the van which Trooper Callahan stopped on July 13, 2005.

(*See* Reply at 1-2). Citing *Bailey v. United States,* 516 U.S. 137 (1995) — a case in which the

Supreme Court defined "use" of a handgun as requiring proof of the defendant's "active

employment" of the weapon for purposes of 18 U.S.C. § 924(c) — Diallo maintains that the jury

lacked enough evidence of "use" to convict him of violating Section 2320 because the

Government did not prove that he "actively employed" counterfeit trademarks. In support of this

7

argument, Diallo emphasizes that Section 2320(a) required the Government to prove *both* trafficking *and* use, a distinction that he claims requires more than the mere transportation of counterfeit merchandise if the "use" term is not to be rendered superfluous. Relying on *Bailey*, Diallo argues that because the bags were sealed up in bags and boxes in the back of his van, there is no evidence that he used (*i.e.*, "actively employed") any counterfeit marks, even if he intended to sell the bags later.

The Government disagrees with Diallo's interpretation of the term "use," insisting that Section 2320 "encompasses *any* use of a counterfeit mark [. . .] on or in connection with goods or services," and specifically includes "adopting a counterfeit mark by acquisition of counterfeit marked goods for retail sale." (*See* Opp. at 3, 10) (emphasis added). The Government cites the legislative history of Section 2320, which states that the statute is intended to punish trafficking in its "incipiency, such as before the counterfeit merchandise has left the factory." (Opp. at 9). Because the version of Section 2320 which Congress ultimately enacted deleted language which required proof that the defendant *actually* marketed or distributed counterfeit goods, the Government contends that it was not required to prove that Diallo displayed or offered the bags for sale.

When construing a statute, a court first must examine the text and give its words their ordinary meaning. *See Moskal v. United States,* 498 U.S. 103, 108 (1990); *see also Kosak v. United States,* 679 F.2d 306, 308 (3d Cir. 1982) (holding that "'our starting point must be the language employed by Congress'") (quoting *Reiter v. Sonotone Corp.,* 442 U.S. 330, 337 (1979)). Where the statutory meaning is unclear, the Court looks to the legislative history to resolve any conflict. *See Cohen v. De La Cruz,* 106 F.3d 52, 57-58 (3d Cir. 1997) (citing

*Patterson v. Shumate,* 504 U.S. 753, 761 (1992)). If the statutory language is neither vague nor ambiguous, however, the inquiry begins and ends with the language of the statute itself. *See Ross v. Hotel Employees and Rest. Employees Int'l Union,* 266 F.3d 236, 245 (3d Cir. 2001).

Section 2320 does not define "use." *See* 18 U.S.C. § 2320(a). "But the mere absence of definitions does not necessarily render the statute vague, particularly where, as here, the terms are subject to interpretation according to their commonly understood meaning." *Forum for Academic and Institutional Rights, Inc. v. Rumsfeld,* 291 F. Supp. 2d 269, 318 (D. N.J. 2003), *aff'd,* 446 F.3d 1317 (3d Cir. 2006); *see also United States ex rel. Almeida v. Rundle,* 383 F.2d 421, 426 (3d Cir. 1967) (explaining that the omission of a definition of "murder" from a statute describing degrees of murder did not render it vague). "When a word is not defined by a statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States,* 508 U.S. 223, 228 (1993) (citation omitted). Unlike the term "use" in 18 U.S.C. § 924(c)(1) — which had "been the source of much perplexity in the courts," *Bailey,* 516 U.S. at 142 — the identical term in Section 2320(a) has spawned little controversy. This suggests that the axiom that "[t]he meaning of a word that appears ambiguous if viewed in isolation may become clear when the word is analyzed in light of the terms that surround it," *see Smith,* 508 U.S. at 229, applies with particular force here. Despite the importance of the term "use" in Section 2320(a), it would be improper for the Court to focus on that word myopically without analyzing it in the context of the subject matter of the statute. *See United States Nat. Bank of Oregon v. Independent Ins. Agents of Am., Inc.,* 508 U.S. 439, 455 (1993) (citation omitted); *see also Singh-Kaur v. Ashcroft,* 385 F.3d 293, 306 (3d Cir. 2004).

Applying these principles to the statute at issue here, the Court notes that the term "use" does not appear in isolation in Section 2320. Rather, the statute punishes anyone who "intentionally traffics or attempts to traffic in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services." *See* 18 U.S.C. § 2320(a). The phrase "on or in connection with" has been read broadly by the Third Circuit when it has appeared in other statutes,[4] and the Court will do likewise here. Moreover, in its proper context, the term "use" does not require proof that a defendant used the mark *per se*, but that he used the mark "on or in connection with [ . . . ] goods or services" for which the genuine mark is actually registered. *See id.*; *see also* 18 U.S.C. § 2320(e)(1)(A).[5] Analyzing the statute in its full context, it is clear that the Government adduced sufficient evidence of "use" — as that term was defined at trial — to permit a reasonable juror to convict Diallo of violating Section 2320.

The few cases which have interpreted or applied the term "use" in Section 2320(a) underscore this conclusion. In *United States v. Song*, 934 F.2d 105 (7th Cir. 1991), the defendant

---

4       *See, e.g.*, *United States v. Loney*, 219 F.3d 281, 284 (3d Cir. 2000) (interpreting the phrase "in connection with" in U.S.S.G. § 2K2.1(b)(5) (a firearms possession statute) as "covering a wide range of relationships between the firearm possession and the other felony offense" because of the "myriad factual contexts in which the phrase might come into play"); *see also Artz v. Barnhart*, 330 F.3d 170 (3d Cir. 2003) (citing *Loney* for the proposition that the "ordinary meaning" of that same phrase was "broad" in 42 U.S.C. § 402(x)(1)(A)(ii), a statute which provided that disability benefits and certain other benefits would not be paid to a person "confined by court order in an institution at public expense in connection with . . . a verdict or finding that the individual is not guilty of [a criminal] offense by reason of insanity.")

5       The legislative history of Section 2320 shows this conjunctive formulation is no accident. (*See* Joint Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. 31673-74 (noting that Section 2320 synthesized a Senate proposal targeting "counterfeit goods or services" and a House proposal penalizing "use of a counterfeit mark" ultimately to require proof of use of a counterfeit mark "on or in connection with" such goods or services)).

was a shopkeeper who had been arrested after a clerk at her store offered to sell undercover agents one fake Gucci watch. A subsequent search of the van Song used to store her goods recovered numerous other fake Gucci watches, plus counterfeit Rolex watches, phony Louis Vuitton handbags, fake Movado watches, and bogus Cartier watches. *See Song*, 934 F.2d at 107. Significantly, although Song's clerk had tried to sell only one Gucci watch — and did not display or offer to sell the agents any other items — Song was charged with five counts of trafficking under Section 2320: one for the Gucci brand that her clerk had offered for sale, and one for each of the other four brands of counterfeit goods that the clerk had not mentioned or shown the agents, but which later had been found stored in Song's van. *See id.* The Seventh Circuit held that Song "was properly convicted of five separate crimes, because she was trafficking in goods bearing five different counterfeit marks." *Id.* at 109. This holding is significant because Song's counterfeit Rolex, Louis Vuitton, Movado, and Cartier merchandise — like Diallo's knock-off handbags — were sitting in a vehicle, and had not been offered for sale. Nevertheless, the *Song* court found sufficient evidence of "use" under the statute. Although Song did not actually challenge the sufficiency of the evidence on this element, *Song* can be read for the proposition that a defendant's possession of goods bearing counterfeit marks makes her guilty of violating Section 2320 — even though she does not display those goods, offer them for sale, or affix the mark to those goods — so long as a reasonable jury could infer that the defendant was using those marks by gathering a saleable quantity of inventory of goods bearing them.

Also instructive is *United States v. Giles*, 213 F.3d 1247 (10th Cir. 2000), in which use was *not* proved under Section 2320. In *Giles*, the Tenth Circuit considered whether a counterfeit label "can be considered a good if it is disconnected from its host good and sold for a profit."

11

*Giles*, 213 F.3d at 1250. The court answered that question in the negative, stating: "[S]ection 2320 does not forbid the mere act of trafficking in counterfeit labels which are unconnected to any goods." *Id.* at 1251. The fact that the court reached this decision despite direct evidence that Giles actively sold the unattached labels shows that "sale" or "display" are not synonymous with "use," as Diallo seems to argue. *See id.* at 1248. Indeed, *Giles* found that proof of "use" in the context of counterfeit marks could not be read outside the context of the phrase "on or in connection with *goods or services for which the genuine mark is actually registered.*" *Id.* (citation omitted and emphasis added). True to the Supreme Court's observation in *Smith* that context may lend clarity to a word which seems ambiguous in isolation, *see* 508 U.S. at 229, the clause "in connection with" indicates that the act of selling the unaffixed marks themselves or marks affixed to products bearing no resemblance to the genuine article is *not* "use" within the meaning of the statute. *See Giles*, 213 F.3d at 1248. In light of the breadth of the clause "in connection with," *Giles* is consistent with the inference that — as long as the spurious mark appears on a "good" resembling the genuine article — practically anything a defendant does with it will amount to "use" of a counterfeit mark in connection with that good within the meaning of Section 2320.[6] *See id.* at 1249.

---

6     The Ninth Circuit has defined "use" even more broadly than the Seventh Circuit in *Song*. In *United States v. Hamamoto*, 232 F.3d 897, 2000 WL 1036199 (9th Cir. 2000), the court considered whether sufficient evidence supported the conviction of a Guam customs agent for trafficking counterfeit goods from Korea. *See id.* at *1. Significantly, Hamamoto merely accepted bribes to clear cargo through his port while another man was the actual merchant. *See id.* Although Hamamoto was not the counterfeiter — indeed, other than the fact that he should have known something fishy was afoot, there was no proof that he knew the contents of the cargo were counterfeit — and thus, did not "sell," "display," "refer to" or "barter" the cargo, the court found sufficient evidence to convict him of violating Section 2320. Thus, the Ninth Circuit's unpublished opinion in *Hamamoto* underscores the proposition that *any* benefit a defendant obtains or attempts to obtain from a counterfeit mark will amount to "use."

12

In light of the foregoing persuasive authorities, it seems clear that Diallo's insistence that

"use" in Section 2320 should be defined as the Supreme Court did when interpreting a firearm

statute in *Bailey* — *i.e.*, as requiring proof that the defendant "actively employed" the mark — is

untenable. The Court reaches this conclusion for three reasons.

First, the Supreme Court recognized long ago that "because words used in one statute

have a particular meaning they do not necessarily denote an identical meaning when used in

another and different statute." *United States ex rel. Chicago, New York & Boston Refrigerator*

*Co. v. Interstate Commerce Comm'n*, 265 U.S. 292, 295 (1924); *see also Commissioner of*

*Internal Revenue v. Aluminum Co. of Am.*, 142 F.2d 663, 668 (3d Cir. 1943) ("[T]he same words,

when used in different statutes, [ . . . may] call for varying interpretations.") (citations and

internal quotation marks omitted). More recently, the Seventh Circuit has cautioned:

> If a court has no other solid basis for construing vague statutory language,
> if other interpretive principles are in equipoise, or if the tribunal wants to
> shore up a determination made mostly on other grounds, then perhaps
> borrowing from an unrelated statute makes sense. However, this is a
> relatively weak aid given that *Congress may well have intended the same*
> *word to have a different meaning in different statutes.*

*See Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 991 (7th Cir. 2001) (emphasis added). In the case

at bar, even a casual reading of the statutes demonstrates that Section 924(c) (the firearms statute

interpreted in *Bailey*) and Section 2320(a) (the trademark infringement statute at issue here) do

not treat "use" similarly. One of the most striking differences between the two statutes is that the

"use" requirement of 18 U.S.C. § 924(c)(1) is satisfied by trafficking alone. *See Smith*, 508 U.S.

at 234-35 ("one who transports [ . . . ] a firearm "uses" it" within the meaning of Section 924(c)

13

and (d)); *see also Bailey*, 516 U.S. at 148.[7] As Diallo emphasizes, however, the same is *not* true of Section 2320, which requires distinct showings of trafficking *and* use. Aside from the fact that this distinction shows that the term "use" in Section 924(c) is not coextensive with that same term in Section 2320(a), it is telling for another reason: it suggests that the Supreme Court adopted a relatively narrow interpretation of the term "use" in Section 924(c) because a more expansive principle — "transport" of a handgun — already was built into that term.

Second, applying *Bailey*'s "active employment" test to trademark infringement would ignore the vital distinction between the object of the regulation in 18 U.S.C. § 924 (handguns used during drug crimes), and the subject matter of 18 U.S.C. § 2320 (trademarks used on knock-off goods). It is not unreasonable to expect that the distinct objects of these statutes may dictate that their common terms be given different constructions. *See United States Nat. Bank of Oregon*, 508 U.S. at 455; *see also Aluminum Co. of Am.,* 142 F.2d at 668 (noting that statutes "are to be read in the light of the mischief to be corrected and the end to be attained"). In *Bailey*, the Supreme Court defined "use" as "active employment" because the nature of the thing being regulated — the "use" *of a firearm* — required a demarcation between the "active" uses covered by 18 U.S.C. § 924(c)(1) and the "inactive" uses to which a firearm also can be put, but which Congress did not intend to criminalize. *See Bailey*, 516 U.S. at 148-49 (noting that a firearm may perform an "ongoing, inactive function" for home defense "because its mere presence emboldens or protects its owner," but that such a use would fall outside the conduct punished by Section 924). Additionally, *Bailey* needed to define the "use" of a handgun *actively* so as not to render

---

[7]      Section 2320 defines the term "traffic" as, *inter alia*, the "transport" of goods or services. *See* 18 U.S.C. § 2320(e)(2).

14

superfluous an alternate, passive basis for liability under the statute: the "carrying" of a gun. *See id.* at 150. Thus the term "use," as it appears in Section 924, is readily intuited as "active employment" because a firearm is used in the commission of a crime when brandished, discharged, or even traded for something of value, whereas it is not used if it is merely being carried or is otherwise inert. *See id.* at 148.

Unlike firearms, spurious marks are abstract symbols which are not "used" in the same way as concrete, utilitarian items. It would be nonsensical to say, for instance, that one would "use" a counterfeit mark in connection with a good or service by "brandishing," "striking with," or "firing" the mark — yet those are some of the most significant ways in which a firearm is used. *See Bailey*, 516 U.S. at 148. Instead, a counterfeit mark is "used" when affixed to goods that resemble the real McCoy.[8] *Song* suggests that amassing an inventory of a saleable quantity of counterfeit goods is "use" under the statute; *Hamamoto* indicates that purposely deriving any benefit from the traffic of counterfeit goods is "use." *Bailey*'s definition of "use" cannot be reconciled with *Song* and *Hamamoto,* which interpreted the same term to have a broader and

---

[8]      A mark by itself — *i.e.*, one unattached to a good similar to those bearing the legitimate marks — would be use*less* within the meaning of Section 2320. Thus, Diallo's insistence that examples of "use" in the context of Section 2320 include "'displaying' *the mark*," "'bartering' or trading with *the mark*," and "'referring to' *the mark*" (*see* Mot. at 7 (emphasis added)) — terms that he adopts from *Bailey* — shows that he has misconceived the focus of the inquiry. As *Giles* indicates, none of the uses of the "mark" that Diallo describes would be actionable at all under Section 2320. *See Giles*, 213 F.3d at 1249-51. Thus, to imply that the Government must prove that a defendant used a "mark" alone is incorrect as a matter of law. Even giving Diallo the benefit of the doubt and assuming that he would argue that these same examples of "use" apply to the use of counterfeit marks *on or in connection with* goods, the Court would agree, but only to a point. Because the uses of counterfeit marks in connection with goods or services are more subtle and varied than are the uses of the firearm which inspired *Bailey*'s examples of "active employment," Diallo's definition of "use" is underinclusive of the ways that "use" may be proved under Section 2320.

15

more nuanced meaning in the trademark infringement context. Reading the term "use" in the context of the thing being regulated, as this Court is required to do, *see United States Nat. Bank of Oregon*, 508 U.S. at 455; *see also Smith*, 508 U.S. at 229-33, it is not unreasonable to expect that the term will mean something different when it is applied to property which derives its value from an abstract symbol than it will when applied to a weapon whose value stems from its concrete, physical utility in protecting, intimidating, or killing.[9]

Finally, a cardinal rule of statutory construction is that "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982); *see also United States v. Cooper*, 437 F.3d 324, 337-38 (3d Cir. 2006) (as amended) (construing a statute to avoid a nonsensical result). To accept Diallo's interpretation of Section 2320 as requiring that "use" be shown by evidence that he was "displaying," "bartering with," "trading with," or "referring to" the Louis Vuitton marks, would require the Court to accept the proposition that he could purchase large quantities of knock-off goods with every intention of profiting from them, haul the spurious inventory from New York to Indiana, and store the

---

[9]     Even if the Court were to accept *Bailey*'s definition of "use," however, it could not read that definition in isolation from *Smith* — which had interpreted the term "use" in that same statute two Terms earlier. *Smith* explained that "use" under Section 924(c) was intended to exclude the "coincidental" or "entirely unrelated" presence of a gun during a drug-trafficking violation. *See Smith*, 508 U.S. at 238; *see also United States v. Locke*, 92 F. Supp. 2d 447, 454 (W.D. Pa. 1999) (quoting *Smith* for the proposition that, to show "use" of a firearm "during and in relation to" the predicate offense, the Government would have to show that the firearm had "some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence."). *Bailey* took care to note that it did not overrule *Smith*. *See Bailey*, 516 U.S. at 148. Diallo does not argue that the "Louis Vuitton" marks were "coincidental" or served no purpose in connection with the handbags; indeed, the evidence showed that the purchase of handbags with these and other designer marks was the *raison d'être* of his July 2005 trip to New York.

16

merchandise out of sight behind the counter of his store, all without running afoul of Section

2320. This interpretation would have profound implications because manufacturers and

distributors who traffic in counterfeit goods would be immune from prosecution as long as they

transported them in cargo containers, crates or bags without displaying them for sale. Neither the

broad language nor the legislative history[10] of the statute can be reconciled with reading it to

proscribe trafficking in counterfeit goods only at the point of retail sale.[11]

Diallo also argues that the 2006 amendment to Section 2320 supports his position. As

amended, the statute now reads, in pertinent part:

> Whoever intentionally traffics or attempts to traffic in goods or
> services and knowingly uses a counterfeit mark on or in connection
> with such goods or services, *or* intentionally traffics or attempts to
> traffic in labels, patches, stickers, wrappers, badges, emblems,
> medallions, charms, boxes, containers, cans, cases, hangtags,
> documentation, or packaging of any type or nature, knowing that a
> counterfeit mark has been applied thereto, the use of which is
> likely to cause confusion, to cause mistake, or to deceive [shall be
> in violation of this statute].

---

[10] *See* S. Rep. No. 98-526, at 5 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3627, 3631 ("To help stem . . . an 'epidemic' of commercial counterfeiting . . . , S. 875 provides for stiff criminal penalties for those who intentionally traffic in goods or services knowing them to be counterfeit."); *see also* Joint Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. at 31673 ("The Senate and House bills both aimed at accomplishing [. . . .] changes in the law[,] [including] creation of criminal penalties for intentionally dealing in materials that one knows to be counterfeit . . . . ").

[11] Recent caselaw interpreting Section 2320(a) confirms that the Government need not prove a defendant actually sold any infringing items, as long as he used the marks in some other way. *See, e.g., United States v. Beydoun,* 469 F.3d 102, 105 (5th Cir. 2006) (rejecting a defendant's contention that he should have been sentenced based only on approximately 32,000 infringing booklets of counterfeit Zig-Zag® cigarette paper that he actually shipped for distribution, rather than the entire 1,000,000-booklet inventory he printed, explaining: "even if Beydoun never sold a single infringing booklet, he remains accountable for the full amount, as he admits he caused infringing items to be produced with the intent to sell them.").

17

18 U.S.C. § 2320(a) (Supp. 2006) (emphasis added). As this amendment makes clear, there are now two ways to prove liability under Section 2320: the first requires proof of "trafficking" in *goods or services* plus knowing "use" of a *counterfeit mark* "on or in connection with" those goods or services, a provision which remained unchanged from the prior version of the statute.[12] *See id.* The second theory of liability, which abrogates *Giles*, requires proof of "trafficking" in *packaging or other paraphernalia* plus knowledge that a *counterfeit mark* "has been applied" to that packaging." *See id.*

Despite Diallo's arguments to the contrary, the Court does not find the amendment to be inconsistent with the definition of the term "use" that it read to the jury at Diallo's trial. Although it is true that the second theory of liability does not require proof of "use" of a mark "in connection with" anything,[13] *see* 18 U.S.C. § 2320(a) (2006), careful review of the statute shows that Congress did not premise the second theory of liability on "trafficking alone," as Diallo argues. Rather, Congress required proof of trafficking in packaging *plus knowledge that a counterfeit mark "has been applied thereto." See* 18 U.S.C. § 2320(a) (2006) (emphasis added). The functional parallel between the requirement of proof that a defendant trafficked in goods or services while he "knowingly uses a counterfeit mark on or in connection with" them, on the one

---

[12]   In light of the fact that the 2006 amendment did not alter a single word of this first theory of liability, Diallo's claim that the amendment renders this Court's analysis irrelevant to cases which will be prosecuted under the new statute is unpersuasive.

[13]   Because the counterfeit "labels, patches, stickers," and other packaging paraphernalia of the sort contemplated by the amendment have not, by definition, been "used in connection with" goods or services, the Court reads the clause ". . . the use of which is likely to cause confusion, to cause mistake, or to deceive" only as requiring proof that packaging goods in or labeling them with the counterfeit marks (*i.e.*, "using" those labels, patches, etc. somewhere down the line) likely would fool a consumer. *See id.*

18

hand, and proof that he trafficked in packaging while "knowing that a counterfeit mark has been applied thereto," on the other, suggests that the phrase "has been applied thereto" is merely a specific example of "use" drafted to address the most likely instance of the use of a counterfeit mark on packaging or paraphernalia. Given that "goods" and "packaging" share a tangibility that "goods" and "services" do not,[14] and on the logic that the general includes the specific, it seems clear that the general term "use" of "goods" would be at least as broad as — and would include — the specific example that Congress identified for packaging and other paraphernalia. On this reading of the statute, Diallo is clearly guilty of "using" counterfeit marks "in connection with" the fake handbags he bought, as the evidence shows that fake designer trademarks "ha[d] been applied" to the bags Trooper Callahan seized from his van.

But even under the Black's Law Dictionary definition of the term "use" that the Court read to the jury during deliberations, it is plain that the Government adduced sufficient evidence to show that Diallo "knowingly use[d] counterfeit marks on and in connection with" the goods in question here. *See* 18 U.S.C. § 2320(a). Diallo admitted to Special Agent Seidman that he had bought the handbags seized from his van during his trip to New York for as little as a few dollars

---

[14]    The difference between the two theories of liability appears to be the result of a substantive distinction between the conduct which was the target of the first theory (trafficking in "goods and services") and the second (trafficking in "packaging" and other paraphernalia). Specifically, the formulation of the phrase "knowingly used a counterfeit mark on or in connection with," *see* 18 U.S.C. § 2320(a), seems to have been dictated by the fact that Congress was searching for a phrase broad enough to cover counterfeit marks as applied to tangibles ("goods") as well as intangibles ("services"). In the 2006 amendment, however, the more concrete formulation of the phrase "knowing that a counterfeit mark has been applied thereto" became possible because Congress only needed to regulate "labels, patches, stickers, wrappers, badges, emblems, medallions, charms, boxes, containers, cans, cases, hangtags, documentation, or packaging," *see id.*, all of which are exclusively tangible. Because "applying" a counterfeit trademark to an intangible service would have made no sense, Congress could not have utilized the term "applied" instead of the term "used" globally throughout the statute.

19

apiece "to fill his store that he had just signed a lease for" in Indianapolis, where he sold such handbags at a significant profit. Diakhaby confirmed that he and Diallo made the trip to New York in July 2005 to buy similar merchandise, and a review of Diallo's financial records and receipts confirmed that he had purchased inventory on that occasion and during previous trips dating back to 2003. The knock-offs Diallo purchased in 2005 bore spurious marks identical to those registered by designers and his bags looked enough like the genuine articles that at least some of his customers were deceived by the merchandise he sold. Despite Diallo's protestations to the contrary, his behavior during the arrest and his prior contacts with law enforcement regarding the same illegal conduct overwhelmingly shows that he knew these bags were counterfeit. All of this evidence permitted a reasonable juror to infer that, on the night he was arrested, Diallo had driven across four states, sought out handbags bearing spurious trademarks, purchased the bags at a discount because of those false marks, and was en route home with the intention of selling them at his store, as he had been doing since 2003. Diallo's knowing, intentional acquisition of handbags emblazoned with spurious marks for sale at a profit at his store was more than sufficient evidence to prove that he had "used" counterfeit marks because he "avail[ed] [him]self of [or] ha[d] recourse to or enjoyment of" them "on or in connection [. . .] with goods or services" for which the genuine marks are actually registered. *See* 18 U.S.C. § 2320(a).

In sum, the Court remains convinced of the correctness of "use" as it defined that term in response to the jury's inquiry. Against that definition of the term "use," and "draw[ing] all reasonable inferences in favor of the jury's verdict," *United States v. Smith,* 294 F.3d 473, 476 (3d Cir. 2002) (citation omitted), the Court cannot say that *no* rational trier of fact could have

20

found proof of Diallo's guilt beyond a reasonable doubt based on the available evidence. *See Coleman,* 811 F.2d at 807. To the contrary, there is substantial evidence that Diallo purchased and transported a saleable quantity of handbags bearing counterfeit marks similar to the genuine articles with the intent to use them for his own profit. This was evidence from which the jury reasonably could infer "use" within the meaning of the statute, and this is the type of "use" that Congress intended to punish.[15]

## V.   Conclusion

For the foregoing reasons, the Court concludes that the Government introduced more than sufficient evidence to permit a reasonable juror to find that all of the elements of 18 U.S.C. § 2320(a) were proved beyond a reasonable doubt. Accordingly, Diallo's Motion for Judgment of Acquittal will be denied.

An appropriate order follows.

Thos M. Hardiman

Thomas M. Hardiman
United States District Judge

March 6th, 2007

_____

[15]     *See* Joint Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. at 31673 ("The Senate and House bills both aimed at accomplishing [. . .] changes in the law[,] [including] creation of criminal penalties for *intentionally dealing in* materials that one knows to be counterfeit . . . .") (emphasis added).

21

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) 2:05-cr-0324 |
| MAMADOU DIALLO, | ) Judge Thomas M. Hardiman |
| | ) |
| Defendant. | ) |

## ORDER OF COURT

AND NOW, this _6th_ day of March, 2007, in accordance with the foregoing

memorandum opinion, it is HEREBY ORDERED that

Plaintiff's Motion for Judgment of Acquittal (Document No. 56) is DENIED.

BY THE COURT:

Thos M. Hardiman

Thomas M. Hardiman
United States District Judge